**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**WHEELING DIVISON**

ELECTRONICALLY
FILED
Dec 31, 2019
U.S. DISTRICT COURT
Northern District of WV

**HEATHER MORRIS, PAMELA
STUMPF, STACEY FACEMIRE,
LULA V. DICKERSON, LISA
WILKINSON, AND KATHRYN A.
BRADLEY,**

            **Plaintiffs,**

**v.**                                      Civil Action No: __5:19-cv-339__ (Bailey)
                                         (Judge _____ )

**WEST VIRGINIA STATE OFFICE OF
THE GOVERNOR and JIM JUSTICE,
In his official capacity as Governor,
WEST VIRGINIA STATE AUDITOR'S
OFFICE and JOHN B. MCCUSKEY,
in his official capacity as State Auditor,
WEST VIRGINIA STATE TREASURER'S
OFFICE and JOHN PERDUE, in his
Official capacity as State Treasurer,
WEST VIRGINIA OFFICE OF SECRETARY
OF STATE and Mac Warner in his official
Capacity as Secretary of State,
WEST VIRGINIA OFFICE OF THE
ATTORNEY GENERAL and Patrick Morrisey,
In his official capacity as Attorney General,
WEST VIRGINIA SUPREME COURT OF
APPEALS and Chief Justice Tim Armstead,
in his official capacity as Chief Justice, and
COMMISSION ON SPECIAL INVESTIGATIONS.**

            **Defendants.**

## COMPLAINT

1.      This is an action brought by the Plaintiffs, Heather Morris, Pamela Stumpf, Lula V.

        Dickerson, Lisa Wilkinson and Kathryn A. Bradley, pursuant to Article 1, Section

10 of the United States Constitution known commonly as the contract clause which states: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts and the 14th Amendment to the United States Constitution granting citizens equal protection under the law.

2.    The plaintiff, Heather Morris, also known as Heather Ewaskey, at all-time material hereto, was a citizen and resident of Hancock County, West Virginia, and is employed by the State of West Virginia as a salaried employee and as said, salaried employee, she is to be paid a set yearly wage.

3.    The plaintiff, Pamela A. Stumpf, at all-time material hereto, was a citizen and resident of Hancock County, West Virginia, and is employed by the State of West Virginia as a salaried employee and as said salaried employee, she is to be paid a set yearly wage.

4.    The plaintiff, Stacey Facemire, at all-time material hereto, was a citizen and resident of Brooke County, West Virginia, and is employed by the State of West Virginia as a salaried employee and as said salaried employee, she is to be paid a set yearly wage.

5.    The plaintiff, Lula V. Dickerson, at all-time material hereto, was a citizen and resident of McDowell County, West Virginia, and is employed by the State of West Virginia as a salaried employee and as said, salaried employee, she is to be paid a set yearly wage.

6.    The plaintiff, Lisa Wilkinson, at all-time material hereto, was a citizen and resident of Kanawha County, West Virginia, and is employed by the State of West Virginia as a salaried employee and, as said, salaried employee, she is to be paid a set

yearly wage.

7.    The plaintiff, Kathryn A. Bradley, at all-time material hereto, was a citizen and resident of Berkeley County, West Virginia, and is employed by the State of West Virginia as a salaried employee and, as said salaried employee, she is to be paid a set yearly wage.

8.    The defendant, Office of the Governor, is a State Agency is charged with the duty and responsibility of the correct and proper payment of wages to the salaried employees for the State of West Virginia.

9.    Jim Justice is the West Virginia State Governor and, in his Official Capacity, has the duty to oversee the payment of all wages due to the employees of the State of West Virginia.

10.   The Office of the Governor and Jim Justice, as the Governor of the State of West Virginia, controls the following State Agencies and Departments and directs all decisions regarding the payment of employees. (*See* **Exhibit A**)

    a.   Division Of Labor, Division Of Miners Health, Safety & Training, Division Of Natural Resources, Division Of Rehabilitation Services, Geological And Economic Survey, Secretary Of Commerce, West Virginia Tourism Office, Workforce West Virginia, Board Of Coal Mine Health And Safety, West Virginia Development Office.

    b.   The Department of Administration which includes Board Of Risk And Insurance Management, Consolidated Public Retirement Board, Department Of Administration, Division Of Personnel, Ethics Commission, Finance Division, General Services Division, Office Of

3

Technology, Prosecuting Attorneys Institute, Public Defenders Service, Public Employees Grievance Board, Public Employees Insurance Agency, Purchasing Division Real Estate Division, Secretary Of Administration, Information Services And Communications, Surplus Property, Travel Management, West Virginia Board Of Osteopathic Medicine, Board Of Accountancy, Board Of Architects, Board Of Barbers and Cosmetologists, Board Of Chiropractic Examiners, Board Of Counseling, Board Of Dentistry, Board Of Foresters, Board Of Funeral Service Examiners, Board of Licensed Dietitians, Board Of Licensed Practical Nurses, Board Of Medical Imaging And Radiation Therapy Tec, Board Of Medicine, Board Of Occupational Therapy, Board Of Optometry, Board Of Physical Therapy, Board Of Professional Engineers, Board Of Professional Surveyors, Board Of Psychologists, Board Of Registered Nurses, Board Of Respiratory Care, Board Of Sanitarians, Board Of Social Work, Board Of Speech Language Pathology and Audiology, Board Of Veterinary Medicine, Massage Therapy Licensure Board, Municipal Pension Oversight Board, National Coal Heritage Authority, Retiree Health Benefit Trust Fund.

c.  The Department of Arts, Culture, and History, which includes Division Of Culture And History, Secretary Of Education And The Arts.

d.  The Economic Development Authority.

e.  The State Department of Education, which includes the Department Of Education, West Virginia School Building Authority.

f.  The Enterprise Resource Planning Board which includes Enterprise Resource Planning Board.

g.  The Department of Environmental Protection which includes Oil And Gas Conservation Commission, Air Quality Board, Department Of Environmental Protection, Environmental Quality Board, Solid Waste Management Board.

h.  The Department of Health and Human Resources, which includes Department Of Health And Human Resources, Division Of Health, Division Of Human Services, Health And Human Resources, Hopemont Hospital, Human Rights, Human Services, Jackie Withrow Hospital, John Manchin. Sr. Health Care Center, Lakin Hospital, Mildred Mitchell Bateman Hospital, Welch Emergency Hospital, William R Sharpe Hospital, Secretary Of Health And Human Resources, Board Of Hearing Aid Dealers, Board Of Pharmacy, Health Care Authority.

i.  The Higher Education which includes Blue Ridge Community And Technical College, Bluefield State College, Bridgemont CTC, BridgeValley Community, And Technical College, Concord University, Council For Community And Technical College Education, Eastern West Virginia Community & Technical College, Fairmont State University, Glenville State College, Higher Education Central Office, Higher Education Policy Commission-Administration, Higher Education Policy Commission-System, Kanawha Valley Community And Technical College, Mountwest Community And Technical College, New River

Community And Technical College, Pierpont Community And Technical College, Shepherd University, Southern West Virginia Community & Technical College, West Virginia Northern Community & Technical College, West Virginia School Of Osteopathic Medicine, West Virginia State University, West Virginia Network For Educational Telecomputing.

j.  The Department of Military Affairs and Public Safety which includes Adjutant General, Anthony Correctional Center, Denmar Correctional Center, Division Of Corrections and Rehabilitation, Division Of Justice And Community Service, Division Of Juvenile Services, Division Of Protective Services, Fire Commission, Homeland Security And Emergency Management, Huttonsville Corrections Center, Lakin Correctional Facility, Martinsburg Correctional Center, Mt. Olive Correctional Center, Northern Regional Jail And Correctional Facility, Ohio County Corrections, Parole Board, Pruntytown Corrections Center, Regional Jail And Correctional Facility, Salem Correctional Center, Secretary Of Military Affairs And Public Safety, St. Mary Correctional Complex, West Virginia Schools for the Deaf and Blind, West Virginia State Police, WV Military Authority.

k.  The Public Service Commission includes Public Service Commission.

l.  The Real Estate Commission which includes the Real Estate Commission.

m. The Department of Revenue, which includes Alcohol Beverage Control Administration, Division Of Financial Institutions, Insurance

Commissioner, Lottery Commission, Municipal Bond Commission, Office Of Tax Appeals, Racing Commission, Secretary Of Revenue, State Budget Office, Tax Division.

n. The Bureau of Senior Services which includes the Bureau of Senior Services.

o. The Department of Transportation, which includes Aeronautics Commission, Division Of Highways, Division Of Motor Vehicles, Division Of Public Transit, Office Of Administrative Hearings, Parkways Authority, Public Port Authority, State Rail Authority.

p. The Department of Veterans Assistance which includes Veterans Affairs Veterans Home.

q. The Water Development Authority.

r. The Courthouse Facilities Improvement Authority which includes West Virginia Courthouse Facilities Improvement Authority.

s. The Educational Broadcasting Authority.

t. West Virginia Public Broadcasting.

u. The Appraiser Licensing Certification Board.

11. The defendant, West Virginia State Auditor's Office, is a State Agency charged with the duty and responsibility of the correct and proper payment of wages to the salaried employees for the State of West Virginia.

12. That John B. McCuskey is the West Virginia State Auditor and, in his official capacity, has the duty to oversee the payment of all wages due to the employees of the State of West Virginia.

13.   That the defendant, West Virginia State Treasurer's' Office, is a State Agency that is charged with the duty and responsibility of the correct and proper payment of wages to the salaried employees for the State of West Virginia.

14.   That John Perdue is the West Virginia State Treasurer and, in his Official Capacity, has the duty to oversee the payment of all wages due to the employees of the State of West Virginia.

15.   That the defendant, West Virginia Office of the Secretary of State, is a State Agency that is charged with the duty and responsibility of the correct and proper payment of wages to the salaried employees for the State of West Virginia.

16.   That Mac Warner is the West Virginia Secretary of State and, in his Official Capacity, has the duty to oversee the payment of all wages due to the employees of the State of West Virginia.

17.   That the defendant, West Virginia Office of the Attorney General, is a State Agency that is charged with the duty and responsibility of the correct and proper payment of wages to the salaried employees for the State of West Virginia.

18.   That Patrick Morrisey is the West Virginia Attorney General and, in his Official Capacity, has the duty to oversee the payment of all wages due to the employees of the State of West Virginia.

19.   That the defendant, West Virginia Supreme Court of Appeals, is a State Agency that is charged with the duty and responsibility of the correct and proper payment of wages to the salaried employees for the State of West Virginia.

20.   That Tim Armstead is the Chief Justice of the Supreme Court and, in his Official

Capacity, has the duty to oversee the payment of all wages due to the employees of the Supreme Court of West Virginia.

21. That the defendant, Commission on Special Investigations, is a State Agency that is charged with the duty and responsibility of the correct and proper payment of wages to the salaried employees for the State of West Virginia.

22. That all of the State Departments, State Agencies and Elected Officials (State of West Virginia) listed herein have a duty to ensure that state employees within their jurisdiction are paid their full wages in the time period that said wages are earned as set forth under **West Virginia Code § 21-5 et seq.** and **West Virginia Code § 21-5C et seq**.

23. Further said State Departments, State Agencies and Elected Officials are required to follow the Constitution of the United States.

24. That the State of West Virginia employs thousands of Salaried employees for which it contracts to pay them an agreed-upon yearly salary in exchange for the employee working the agreed-upon amount of time in the monthly or annual work year.

25. That pursuant to West Virginia Law, all employees who earned their salaries during the said fiscal or annual calendar year are to be paid their full yearly and monthly salary.

26. That the **West Virginia Code § 6-7-1** legislates the timeliness and manner in which State employees are to be paid wages that are due and owing.

27. That as far back as 1943, the Supreme Court of the State of West Virginia has interpreted **West Virginia Code § 6-7-1** to require that State employees be paid

their monthly wages at the end of each month **State ex rel. Graney v. Sims**, 144 W.Va. 72, 105 S.E.2d 886 (1958).

28.     That in West Virginia, wherever a statute uses the word monthly is shall mean a calendar month, **West Virginia Code § 2-2-4**.

29.     That **West Virginia Code § 12-3-13** prohibits the payment of wages in advance of the service being provided.

30.     That until 1997 all State employees were paid their monthly salaries that were earned each month at the end of the month pursuant to **West Virginia Code § 6-7-1**.

31.     That in 1997, **West Virginia Code § 6-7-1** was amended to allow the State to pay employees employed after July 1, 1999, one pay cycle in arrears except for elected officials who were always to be paid concurrently when wages were due.

32.     The 1997 amendment also stated that all State Employees were to be paid twice per month.

33.     That the State of West Virginia claimed that paying its employees one pay cycle in arrears was in the State of West Virginia's interest because the State of West Virginia would then have one pay cycle to make sure that the payroll was correct.

34.     That without the 1997 amendment allowing state employees to be paid one pay cycle in arrears, the State of West Virginia would have had to pay all of their employees at the end of the month or said payments would have been untimely and in violation of West Virginia wage laws.

35.     That as a result of this amendment, the State of West Virginia had two classes of employees, those that were being paid wages concurrently and those that were

being paid one pay cycle in arrears.

36.   That the one pay cycle in arrears as a practical manner was simply a bookkeeping function and that in effect, the State of West Virginia simply withheld new employee's first paycheck and that after being employed one year, a State employee received their entire annual salary by the end of each year.

37.   That once an employee left employment with the State of West Virginia, they were paid the one pay cycle that had been withheld when they first started their employment.

38.   That pursuant to **West Virginia Code § 6-7-1** after 1999, all employees received their full annual salary in twenty-four (24) payments per year or on a bi-monthly basis.

39.   That even if one took the "one pay cycle in arrears" into account, then the lag employees would receive their full pay for work performed in the prior year by the first pay cycle of the new year.

40.   That in 2014, **West Virginia Code § 6-7-1** was amended to state that state employees shall be paid at least twice a month and added that after July 1, 2014, all state employees paid on a current basis would be converted to payment in arrears.

41.   That importantly, the 2014 amendment stated, "Nothing contained in this section is intended to … diminish the salary or wages of any employee.

42.   That as a result of his amendment, all state employees should now be paid one pay cycle in arrears, but the State of West Virginia did not make this conversion for employees employed prior to July 1, 1999, other than to make a bookkeeping

adjustment.

43.   That, in effect, state employees employed prior to July 1, 1999, continued to be paid concurrently along with elected officials.

44.   That the amounts to be paid to state employees are set forth in the Division of Personnel, the Judicial Personnel Manual, and various State Codes.

45.   That in addition, state employees receive letters from the State of West Virginia setting forth their annual salary.

46.   That as a result of the 2014 amendment to **West Virginia Code § 6-7-1**, the State of West Virginia decided to change the pay cycles to bi-weekly or twenty-six (26) pay cycles.

47.   That converting the pay cycles from twenty-four (24) payments to twenty-six (26) payments does not require that the state employees' salary be diminished or that they have pay withheld (*See* **Exhibit B** and **Exhibit C**).

48.   That, instead of simply changing the payroll cycle from Bi-Monthly to Bi-Weekly the Executive Branch, the Judicial Branch, and the Commission on Special Investigations used the conversion to take approximately 1.75% or greater from each employee's annual pay except for those holding the position of an elected official.

49.   As a result of this taking each employee's salary for the year in which the conversion from Bi-Monthly to Bi-Weekly occurred, each employee's salary was reduced by 1.75% or greater.

50.   That the Executive Branch, Judicial Branch, and the Commission on Special Investigations have taken the position that they were simply borrowing this money

from the State employees and that said monies would be recovered when an employee left State employment.

51.     This "borrowing" of wages from State Employees placed the employee's wages to pay cycles in an additional arrearage in violation of **West Virginia Code § 6-7-1**.

52.     That the conversion was to take place in three waves in 2015, 2016, and 2017.

53.     That the State of West Virginia used the conversion as an opportunity to take wages due and owing from its employees for its own purpose without any rational state reason for taking said wages.

54.     That the State of West Virginia intentionally selected an altered wage payment to create an employee shortfall at the end of the fiscal year so that the State of West Virginia could retain a portion of the state employee's wages. (*See* **Exhibit D**)

55.     That the State of West Virginia decided to make the pay change for only a partial number of employees in 2015 and called this change Wave 1.

56.     That it is Wave 1 was implemented in the same manner as Wave 3, which is set forth in detail herein.

57.     That once Wave 1 was complete, all of those employees affected had been shorted monies due them in 2015 as the paychecks issued did not add up to their yearly salary.

58.     That beginning in the year 2016, all employees in Wave 2 were once again paid in full their yearly salary, but the shortage for the prior year was still due and owing.

59.     That the State of West Virginia decided to make the pay change for the second group of employees in 2016 and called this change Wave 2.

60.     That it is believed that Wave 2 was implemented in the same manner as Wave 3,

which is set forth in detail herein.

61.     That once Wave 2 was complete, all of those employees affected had been shorted monies due them in 2016 as the paychecks issued did not add up to their yearly salary.

62.     That beginning in the year 2017, all employees in Wave 2 were once again paid in full their yearly budgeted salary, but the shortage for the prior year was still due and owing.

63.     That the State of West Virginia decided to make the pay change for the final group of employees in 2017 and called this Wave Stage 3.

64.     That the implementation of Wave 3 which is based upon the three classes of employees that existed in 2016 that were not a part of Wave 1 or 2 including elected officials being paid concurrently, non-lag state employees which were being paid concurrently and the one pay cycle in arrears employees, lag employees (*See* **Exhibit E**).

65.     That in 2016 all three classes were paid twenty-four (24) equal payments on a bi-monthly basis with the elected official receiving a full annual salary of $126,00.00 on December 30, the non-lag employee full annual salary of $46,237.20 on December 30 and the lag employee full annual salary of $38,112.00 on December 30 (the salaries are examples of employees receiving those annual amounts).

66.     That in 2017 the three classes were subject to Wave 3.

67.     That the state employees began the year for Wave 3 state employees on a twenty-four (24) payment schedule and continued that schedule through May 30.

68.     That the Wave 3 state employees were switched over to twenty-six (26) payments

beginning with the first pay cycle in June.

69.   That because this changeover was being implemented in a way that would allow the State to underpay its employees in the year in which the Wave was implemented, the change resulted in the need to pay the state employees a "gap" paycheck" or a payment in addition to the bi-weekly paycheck to pay for all days worked.

70.   That on or about September 2015, the Governor of the State of West Virginia expressed concern that the change in the payroll system would cause him to be shorted on his yearly salary of $150,000.00 in the same manner as an employee of the state of West Virginia would be shorted. As a result of his complaint by the Governor, a supplemental check was issued to the Governor to make up the shortfall caused in his pay (all of which was due and owing). (*See* **Exhibit D**)

71.   That as a result of this action by the Governor, all of the elected officials named herein had supplemental checks issued to themselves to cover any shortfall in pay (all of which was due and owing).

72.   That when the West Virginia Supreme Court issued the change in pay that resulted in a shortfall to all salaried employees working for the West Virginia Supreme Court (i.e., the Judicial System) the Court authorized a supplemental check to be paid to all Supreme Court Judges and Circuit Court Judges so that they would not lose any pay in the year of the changeover (all of which was due and owing).

73.   That the elected officials making $126,000.00 annually were paid a gap payment of $807.69 in advance in violation of **West Virginia Code § 12-3-13**.

74.   That a "gap" payment is nothing more than paying employees for days worked

instead of the State of West Virginia failing to pay a portion of the state employee's salary.

75.   That elected officials were then paid twice for days worked for May 27, 28, 29, 30, and 31.

76.   That as a result, elected officials received their full annual salaries on December 22 or nine (9) days before said annual salary was due in violation of **West Virginia Code § 12-3-13**.

77.   That the non-lag employee who was on the same pay cycle as the elected officials were only paid $1,659.80 on May 30th despite being owed $1,926.55 for work that had been performed.

78.   That the non-lag employee is credited with having earned $1,926.55, but then the State of West Virginia simply deducted $266.75 from earned pay, as shown in **<u>Exhibit F</u>**.

79.   That because the State of West Virginia failed to pay for all days worked in the "Wave" year, the non-lag employee was paid $563.14 less than what was due and owing.

80.   That the lag employee who was on the same pay cycle as the elected officials were only paid $1,294.83 on May 30th despite being owed $1,588 for work that had been performed.

81.   That the State of West Virginia simply deducted $293.17 from earned pay.

82.   That because the State of West Virginia failed to pay for all days worked in the "Wave" year, the lag employee was paid $659.63 less than what was due and owing.

83.   That the amounts listed herein are examples of given employees, but all state employees were affected in the same manner based upon the amount of pay that they received. (*See* **Exhibit G**)

84.   That Employees for the Kanawha County Judicial system was shorted in their "Wave" year and then went back to their annual salary the following year. (*See* **Exhibit H**)

85.   That Employees for the Supreme Court, which mirrors what occurred with other state employees, were shorted in their "Wave" year and then went back to their annual salary the following year. (*See* **Exhibit I**)

86.   That the State of West Virginia admits that they took the money of the state employees but that **West Virginia Code § 6-7-1** as amended allows the State of West Virginia to not pay wages in a timely fashion.

87.   That it is the State of West Virginia's position that it can fail to pay said wages and simply redefine when the State of West Virginia will pay said wages in the future.

88.   That as a result, the State of West Virginia claims that it now "borrows" over 40% of an employee's paycheck to pay back the money that was "borrowed" or taken during the Wave conversion.

89.   That this "borrowing" that is on a continuous basis places employees two pay cycle's in arrears.

90.   That this "borrowing" is a bookkeeping function and that as a matter of practicality, the employees will not be paid back in full for the wages that were taken until they leave employment with the State of West Virginia if they are ever paid for wages that were taken.

91.    That based upon the State of West Virginia's theory, anytime the State of West Virginia wants to "raise" money, they can simply withhold wages that are due and owing and "reset" the pay cycle so show payment of those unpaid wages in the future.

92.    That the State of West Virginia takes this position despite the fact that **West Virginia Code § 6-7-1** clearly states "Nothing contained in this section is intended to … or diminish the salary or wages of any … employee.

93.    That at all times, the State of West Virginia has been aware that wages were not fully paid during the "wave" years.

94.    That as a result of not paying wages due and owing the State of West Virginia has taken as much as $30,000,000.00 from the state employees.

95.    That a class action lawsuit was filed against all of the executive agencies and the judicial branch on June 13, 2019, by plaintiffs Heather Morris, Pamela Stumpf, Lula V. Dickerson, Lisa Wilkinson and Kathryn A. Bradley although Commission on Special Investigations was not named as a defendant to obtain the wages that had been withheld and to contest the Executive Branch, and Judicial Branch placing the affected State Employees payment to pay cycle's in arrears.

96.    That the plaintiffs also requested class certification.

97.    That suit was filed in State Court because a clear reading of the 2014 amendment to **West Virginia Code § 6-7-1** states that employees pay could only be one pay cycle in arrears and that elected officials could not take Wages that were contractually due and owing while paying themselves in advance.

98.    That in addition, the 2014 amendment to **West Virginia Code § 6-7-1** clearly

states that the wages of state employees are not to be diminished.

99. That the 2014 amendment to **West Virginia Code § 6-7-1** did not set up a separate class of State Employees in which those employees employed before July 1, 2017, were to be paid two cycles in arrears and those employees employed after July 1, 2017, were to be paid one cycle in arrears.

100. That under **West Virginia Code § 6-7-1**, it appears to be the clear intent of the West Virginia Legislature that all state employees are to be paid on the same pay cycle and that State Employees are simply to be paid on the pay cycle in arrears from elected officials.

101. Further **West Virginia Code § 6-7-1** did not exempt elected officials from receiving advanced payments as set forth in **West Virginia Code § 12-3-13**.

102. That since all employees are on the same pay cycle and no one could be paid in advance, this would keep any elected official from changing an employee's pay cycle for the purpose of taking or borrowing State Wages since and such action would also affect the wage payments of the elected officials.

103. It was believed that perhaps the taking of State Employee wages were done by mistake and that once the same was under Judicial review in the State of West Virginia that the State would be ordered to follow clear intent and direction of West **Virginia Code § 6-7-1** and that all employees would once again be paid one pay cycle in arrears and unpaid wages would be returned.

104. That since all of the sitting Judges had a conflict, a special retired Judge, Thomas Evans, was appointed by the Chief Justice of West Virginia Supreme Court.

105. In response to the civil action that was filed the Judicial Branch, "West Virginia

Supreme Court" and all of the executive agencies took the position that the plaintiffs' position was incorrect and that the intent of the West Virginia Legislature in amending **West Virginia Code § 6-7-1** was to allow the Executive Branch, Judicial Branch to in fact take the wages of its employees that were employed prior to July 1, 2017.

106. That Supreme Court and the State Agencies admitted that employees did not receive their annual salaries but took the position that they could change take wages from employees by "changing" the pay cycle so long as they potentially paid them sometime in the future for all wages that were taken.

107. That the Supreme Court and the State Agencies admitted that elected official were being paid in advance but took the position that elected officials under **West Virginia Code § 6-7-1** were entitled to special treatment which allowed for them to be paid in advance and that manner that elected officials paid themselves had no relationship to the State Employees.

108. That the Supreme Court and the State Agencies moved for Summary Judgment seeking to have the State Employees case dismissed on the pleadings.

109. That the Honorable Judge Thomas Evans ruled in favor of the Supreme Court and the State Agencies and granted the motion for Summary Judgement under Rule 56 of the West Virginia Rules of Civil Procedure.

110. That Judge Evans, in a ruling from the bench, found that a reading of **West Virginia Code § 6-7-1** as amended now allowed for defendants to change their pay cycles to take wages from the State Employees.

111. That Judge Evans also found that the elected officials could pay themselves in a

manner of their choosing, including advance payments and that their separate payments to ensure that they received their annual pay in advance had no relevancy as to the pay cycle for State employees.

112.   That this ruling by the Judicial Branch causes the interpretation of **West Virginia Code § 6-7-1** as amended in 2014 to now allow the "State" to "borrow" money from its employees, pay its employees hired before July 1, 2017, more than one pay cycle in arrears and to change the pay cycle without paying monies that are due to take money from State Employees.

113.   That Judge Evans did not issue any ruling from the bench on whether the Executive Branch and Judicial Branch had to pay back the money that was taken at the time an employee leaves State employment, and no legal plan has been put in place for said repayment.

114.   That Judge Evans granted the summary judgment without certifying the class as requested.

115.   That Judge Evans has, as of this date, not issued a final Order but simply ruled from the bench, and the parties are awaiting the final Order.


## CLASS ALLEGATIONS

116.   That the preceding paragraphs are re-alleged as if restated herein.

117.   That the Plaintiffs bring this suit for themselves and for a class consisting of the group of salaried West Virginia state employees who had not been paid full wages for the year in which their paychecks went from Bi-Monthly to Bi-Weekly.

118.   That the Plaintiff adequately represents the class of persons defined above.  The

represented class is narrowly and appropriately defined West Virginia state employees who had not been paid full wages for the year in which their paychecks went from Bi-Monthly to Bi-Weekly.

119.   The proposed class has been estimated as consisting of at least twenty to thirty thousand salaried employees.

120.   This action may be properly prosecuted as a class action under **Rule 23** of the *Federal Rules of Civil Procedure*.  The persons constituting the Class, in excess of 20,000 employees, in this case, are numerous enough to make it impractical to bring them all before this court.  Thus, the numerosity requirement of **Rule 23(a)** is satisfied.

121.   There are many common questions of law and fact affecting the rights of each class member, and a common relief is sought by the class members, and thus the "commonality" requirement of **Rule 23(a)** is satisfied.

122.   The question of whether the defendant failed to pay or cause wages to be paid turns on the same issues of fact and law.  In other words, the West Virginia State Auditor's Office's conduct affected the proposed class similarly as required by **Rule 23(a)**.

123.   The theories of relief are identical to all members of the Class, and all members of the Class are alleged to have suffered similar kinds of damages as a result of failure to Pay Wages that were due.

124.   The named Plaintiffs claims are typical of the claims of the other members of the Class, and thus the "typicality" requirement of **Rule 23(a)** is satisfied.

125.   Ranson Law Offices, Jacobs Law Office, Toriseva Law, and McCoid Law Offices

P.L.L.C. are experienced in the prosecution of class actions and have adequate resources to prosecute this class action. The work done by the law firms to date shows that the firms can adequately represent the class, which fulfills the first part of the adequacy requirement of **Rule 23(a)**. *See*, In re Rezulin Litigation, 214 W. Va. 52, syl. Pt. 13 (2003) (*breaking adequacy requirements into two parts*).

126.   The named Plaintiffs claim the same damages resulting from the conduct of the defendant as the proposed Class defined herein and does not have a conflict of interest with the proposed Class.   Thus, the second part of the "adequacy" requirement of **Rule 23(a)** has been satisfied. *See*, In re Rezulin Litigation, 214 W. Va. 52, syl. Pt. 13 (2003) (*breaking adequacy requirements into two parts*).

127.   This class action may be maintained because the prosecution of separate actions by individual members of the defined class would create a risk of inconsistent and varying adjudications, which would establish incompatible standards of conduct for the Plaintiffs and the Class members.

128.   Adjudication with respect to individual members of the Class would be, as a practical matter, dispositive of the interests of other members of the Class, not parties to such adjudications, thereby impairing or impeding their interests.   Thus, this class action may be maintained under **Rule 23(b)(1)**.

129.   This Class action may also be maintained because, as noted above, the many questions of law and fact that are common to the class clearly *predominate* over questions, if any, affecting only individual members of the Class, and a class action is superior to other available means for the fair and efficient adjudication of the controversy.   With respect to other potential means – such as traditional individual

cases, mass action, or traditional consolidation – those are not practical since the damages claimed by individual members of the proposed class are likely to be exceeded by the costs of prosecuting any individual class member's claim, even in a consolidation proceeding.  Thus, the Class may also be maintained under **Rule 23(b)(3)**.

130.   That on April 11, 2019, Ann Urling, Deputy Chief of Staff of the Governor, wrote a memo that was forwarded to State employees in which said employees were instructed not to seek legal counsel. That this memo has a chilling effect on West Virginia State employees from the governor create the need for class certification. (*See* **Exhibit A**)

# COUNT I
# VIOLATION OF CONTRACT CLAUSE

131.   That the preceding paragraphs are re-alleged as if restated herein.

132.   That Article 1, Section 10 of the United States Constitution known commonly as the contract clause which states: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts."

133.   The State of West Virginia, via Division of Personnel and Judicial Personnel Manual, statutes set forth the annual payments to its employees.

134.   That in addition, most if not all employees will receive a letter that sets forth their annual salary. (*See* **Exhibit J**)

135.   That **West Virginia Code § 6-7-1** sets forth the manner in which employees will be timely paid their wages.

136.   That **West Virginia Code § 6-7-1** states that employees will be paid monthly for the wages earned that month with the understanding that employees will be paid

one pay period in arrears, which means each monthly payment will be paid in the first pay cycle of the next month.

137. That since employees are paid one pay cycle in arrears, employees are to receive their full annual salary in the first pay cycle of the next year.

138. That after an employee works one year, they are in effect paid their full annual salary each year that they work, and the first pay cycle that was withheld is simply paid when a state employee leaves the State of West Virginia's employment.

139. That while the terms and conditions of public employment are ordinarily considered to be statutory rather than contractual, and they are subject to modification at the discretion of the governing legislative body. Constitutional protection can arise, however, (1) when the statute or ordinance establishing a benefit of employment and the circumstances of its enactment clearly evince an intent by the relevant legislative body to create contractual rights (**Cal Fire Local 2881 v. Cal. Pub. Employees' Ret. Sys**., 6 Cal.5th 965, 435 P.3d 433, 244 Cal.Rptr.3d 149 (Cal. 2019).

140. That since at least 1997 employees the State and its employees had a course of dealing under which it was understood that employees would be paid on the fifteenth and last day of every month with the wage payments being one pay cycle in arrears of established cycle.

141. That an amendment to **West Virginia Code § 6-7-1** in 2014 allowed for employees to be paid at least twice a month and one pay cycle in arrears did not change that expectation.

142. That the 2014 amendment to **West Virginia Code § 6-7-1** clearly stated that

nothing in this section is intended to … diminish the salary or wages of any … employee.

143. That a State's course of dealings with its employees can create a contractual expectation. (See **Univ. of Hawaii Prof'l Assembly v. Cayetano**, 183 F.3d 1096 (9th Cir. 1999).

144. That a second lag payment in excess of the first lag payment has a "significant and material impact on the employees' working conditions in creating a financial hardship for the employees" since affected employees have surely relied on full paychecks to pay for such essentials as food and housing. Many have undoubtedly committed themselves to personal long-term obligations such as mortgages, credit cards, car payments, and the like-obligations. (See **Association of Surrogates & Supreme Court Reporters v. New York**, 940 F.2d 766 (2d Cir. 1991) (Surrogates I)

145. That as it relates to the plaintiffs and other similarly situated State employees, the Executive Branch, Judicial Branch, and the Commission on Special Investigations failed to pay wages that had already been contractually earned by the employees.

146. That in an action under the Contract Clause, the inquiry is whether the impairment is substantial.

147. That it has been decided by multiple Courts that an annual salary reduction of .95% is not insubstantial.

148. That in the month of May 2017, the Supreme Court reduced the monthly salary of its employees by approximately 13% by failing to pay wages that had already been earned and were due and owing.

149.  That as a result of the employees of the state of West Virginia employed before July 1, 2017, now being two paychecks in arrears the Executive Branch, Judicial Branch, and the Commission on Special Investigations now take approximately 44% of each 2nd arrearage wage payment to pay for wages that the state "borrowed" in 2017 or the year of the Wave Conversion.

150.  That a State is not completely free to impair the obligation of its own contracts.

151.  That if the State was allowed to simply create an additional lag-payroll at its discretion then the question would become if the employees would ever receive their lagged wages or if the State could simply take Wages from said employees anytime they simply wanted those wages for their own purpose. (*See* **Condell v. Bress**, 983 F.2d 415 (2nd Cir. 1993).

152.  That when a State causes a substantial impairment, then the State must show a reasonable means to a legitimate public purpose.

153.  That Courts should be less deferential to a state's judgment of reasonableness and necessity when a State's actions are self-serving and impair obligations under its own contracts.

154.  That Executive Branch, Judicial Branch, and the Commission on Special Investigations have not set forth any rational state reason for "borrowing" wages from its employees and creating an addition lag payroll or additional debt to be potentially paid in the future.

155.  That the directive from the State Legislature in its 2014 amendment to **West Virginia Code § 6-7-1** simply allowed for the Executive Branch, Judicial Branch, and the Commission on Special Investigations to make bi-weekly payments since

under bi-weekly payments some months would require three paychecks.

156.   That changing the pay cycle from 24 payments to 26 payments does not require the taking or lagging of wages due and owing to employees.

157.   That Executive Branch, Judicial Branch, and the Commission on Special Investigations have taken the position the 2014 amendment to **West Virginia Code § 6-7-1** allows for them to create additional lag payments in an employee's pay by recreating pay cycles that lag the payment of the employees.

158.   That the Executive Branch, Judicial Branch, and the Commission on Special Investigations admit that on May 30th, 2017, they did not pay their employees for work performed between May 1 and May 16th even though the non-lag employees had already been paid for those dates.

159.   The State admits that it only paid lag employees for working between May 1 and May 12 on May 30, 2017.

160.   The State takes the position that on May 30, 2017, it created a 12 wage pay cycle and then paid the employees on June 9, 2017, or 14 days later for work performed from May 13-May 26 to create a 14-day cycle which it continued to keep the said employees lagging one pay cycle in arrears.

161.   That under this interpretation of **West Virginia Code § 6-7-1** any time the State Agencies wanted additional monies, they could simply not pay a full pay cycle and then start a new cycle all over again and claim employees were still one pay cycle in arrears.

162.   That when a full pay cycle is cut short, the wages that are were not paid now get pushed further into the future and create an additional lag well beyond the intended

pay cycle.

163. As a result, employees who were due full wages on May 30 for work already performed for May 1-16 did not receive full compensation until June 9, 2017, because their full pay was pushed nine days in the future.

164. That non-lag employees were paid their last bi-monthly check for work performed May 17-May 31 on May 31, 2017.

165. That lag "State" employees who would have received their pay for May no later than June 15, 2017, were not paid their full wages for May until June 23, 2017.

166. That under the Executive Branch, Judicial Branch and the Commission on Special Investigations theory the State has the right under the 2014 amendment to **West Virginia Code § 6-7-1** even under its current bi-monthly wage cycle to simply pay an employee for 7 days of work when a 14-day paycheck is due and then restart the 14-day cycle by pushing the 7 days not paid further into the future.

167. That restarting a pay cycle after failing to pay wages that are due and owing does not keep an employee simply on pay cycle in arrears instead it pushes wages that were due and owing at the time into the future creating a Lag payroll in excess of a one pay cycle in arrears that had been in place since 1997.

168. Once wages are withheld from a pay cycle, each payment that is paid must be for wages that were previously withheld, and therefore, monies are borrowed to pay back monies owed for a prior wage cycle or monies paid annually must be used to pay for monies not paid in the prior year.

169. That, as a result, employees employed before July 1, 2017, who would have received their full wages on or before January 15 of the next year, have to wait

until late January to now receive their full payment.

170.    That this additional lag payment explains why employees of Executive Branch, Judicial Branch, and the Commission on Special Investigations did not receive their full annual salaries in the year of the Wave and why the money that was not timely paid will not be recovered unless the State pays them for two pay cycles after they terminate their employment which could be multiple years in the future.

171.    That the State acknowledges, the fact that employees pay was shorted by paying in advance 1.79% of the elected officials to assure that they would not lose the amount of salary that was being taken/deferred from State employees.

172.    That the claim by Executive Branch, Judicial Branch, and the Commission on Special Investigations that the newly enacted 2014 amendment to West Virginia Code § 6-7-1 allows them to defer employee payments violates the Contract Clause of the United States Constitution and the employees contractual right to be timely paid.

## COUNT II
## VIOLATION OF THE EQUAL PROTECTION CLAUSE

173.    That the preceding paragraphs are realleged as if restated herein;

174.    That the 14th amendment of the United States Constitution states that "no state shall make or enforce any law which shall … deny to any person within its jurisdiction the equal protection of the laws.

175.    That the Equal Protection Clause affords protection against unequal treatment respecting public-sector employees' entitlement to, securing wages if it resulted from arbitrary state action-- an action that has no rational basis.

176.    That prior to 2014, the timely payment of wages in West Virginia consisted of two

groups; employees who were paid monies that were due at the end of each pay cycle and employees who were paid one pay cycle in arrears.

177. That the legitimate public purpose given by the State of West Virginia is that by paying on pay cycle in arrears, the State had time to factor in missed work to make sure that the wages paid were proper.

178. That, since elected officials could, in theory, not miss work, the State's position, was that they could be paid on time.

179. That based upon the 2014 amendment to **West Virginia Code § 6-7-1** the Executive Branch, Judicial Branch, and the Commission on Special Investigations have now created four classifications of employees; elected officials who are paid in advance by at least one half of a pay cycle in violation of **West Virginia Code § 12-3-13**; employees who are paid at the end of each pay cycle who are owed approximately one week of pay; employees who were employed after the completion of the waves (approximately July 1, 2017) who are paid one pay cycle in arrears and employee hired after July 1, 1999, and before end of wave 3 (approximately May 1, 2017) who are in fact two pay cycles in arrears.

180. That as a result, elected officials receive their full annual salary on or about December 21 of the calendar year or 10 days in advance; employees employed before July 1, 1999, who are paid all but approximately one week pay on December 21 of the calendar year; employees employed after the waves who receive their annual pay on or about January 4 of the next year or one pay cycle after the elected officials and non-lag state employees and employees hired after July 1, 1999, and before the end of the Waves who receive their full annual pay on January 18 of the

next year or two pay cycles behind the elected official and one pay cycle behind State Employees employed after the Waves.

181.    That the State has not set forth any rational reason for paying elected officials in advance, paying a portion of State employees once pay cycle in arrears from the pay received by elected officials and paying a portion of State employees two pay cycles from pay received from elected officials.

182.    That the State of West Virginia now has employees who are owed the one pay cycle for the first week that they were employed along with the money that was borrowed during the wave; employees who were never in arrears who are owed the money that was "borrowed" during the wave and employees who were hired after the Waves who are only owed the one pay cycle for the first week that they were employed since the State of West Virginia has not "borrowed" any money from employees hired after approximately May 1, 2017.

183.    That all State employees are entitled to equal protection under the 14th amendment and should receive their pay in the same timely fashion.

## COUNT III
## MANDAMUS

184.    That the preceding paragraphs are re-alleged as if restated herein.

185.    That the Elected Defendants, as stated herein, individually, collectively, and in concert with each other, by virtue of the Constitution of the State of West Virginia and the high offices that they occupy and with which they have been entrusted by the citizenry of this State, have imposed on them a non-discretionary duty to responsibly and lawfully manage the public purse and expend monies budgeted and appropriated by the Legislature for payment of, *inter alia*, wages to Plaintiff

and the members of the class to which Plaintiff belongs within the fiscal year for which such monies were budgeted and appropriated.

186.   That employees are entitled to be paid all wages owed in a timely fashion.

187.   The extraordinary remedy of mandamus is a proper remedy by which to compel a public officer to perform a mandatory, non-discretionary duty.  **Delardas v. County Court**, 155 W. Va. 776, 186 S.E.2d 847 (1972).

188.   A writ of mandamus will not issue unless three elements co-exist: (1) a clear legal right in the Petitioner to the relief sought; (2) a clear legal duty on the part of the respondent to do the thing which petitioner seeks to compel; and (3) the absence of another adequate remedy.  Syl. Pt. 2, **State ex rel. Kucera v. City of Wheeling**, 153 W. Va. 538, 170 S.E.2d 367 (1979).

189.   By implementing the Plan as aforesaid, the Elected Defendants, individually and in concert with each other, proximately caused a gap in payment of wages to Plaintiff and the members of the class to which Plaintiff belongs beyond what is permitted by **West Virginia Code § 21-5-3(a)** and the West Virginia Constitution.

190.   That the elected officials could not have approved the plan to take the wages of State employees without also putting in a place a plan to pay themselves a gap payment as they would have lost wages as well.

191.   By implementing the Plan as aforesaid and by virtue of the gap in payment beyond what is permitted by **West Virginia Code § 21-5-3(a)**, and the West Virginia Constitution the Elected Defendants, individually and in concert with each other, proximately caused the State of West Virginia to take the wages of employees from FY 2015, FY 2016 and  FY 2017; thus, Plaintiffs and the members of the class to

which Plaintiff belongs are owed gap wages in perpetuity.

192. That as a result of the failure to pay wages owed to Plaintiffs and the members of the class to which Plaintiffs belong, approximately thirty million dollars ($30,000,000.00) have been taken from the State of West Virginia.

193. That Plaintiffs and the members of the class to which the Plaintiffs belong have the right to payment of their wages by the Elected Defendants within the time period specified in **West Virginia Code § 21-5-3(a)** and within the fiscal year for which such monies were appropriated by the Legislature by virtue of **W. Va. Cost. Art. 10, § 4**. *Cf.* Leviticus 19:13 (in part) ("The wages of a hired man are not to remain with you all night until morning.").

194. The Elected Defendants have breached the duty imposed on them by **W. Va. Cost. Art. 10, § 4**, and **West Virginia Code § 21-5-3(a)** to timely pay wages to Plaintiff and the members of the class to which the Plaintiff belongs.

195. The monies budgeted by the West Virginia Legislature for the payment of wages to the Plaintiff and the members of the class to which the Plaintiff belongs were expended otherwise by the Defendants.

196. That there is no assurance that the West Virginia Legislature will appropriate funds in the future to pay delayed wage payments. The West Virginia Legislature may decide to fund future salaries or may reduce future salaries. Additionally, the West Virginia Legislature may decide to no longer fund a complete Agency. The fact that Plaintiffs and the members of the class to which Plaintiff belongs in theory maybe eventually be fully compensated by the Elected Defendants and receive their wrongfully withheld wages upon their respective resignations, terminations, or

retirements, receipt of such eventual future compensation, potentially years or decades into the future, is speculative and chimerical.  As such, Plaintiff and the members of the class to which Plaintiff belongs enjoy no other *adequate* remedy at law to compel payment of their wrongfully withheld wages.

197.   That the Governor of the State of West Virginia sent out a memo to Departments and Cabinet Heads controlled by the Governor's office, ordering them not to pay their employees. Further, the reason that the Governor directed the nonpayment of the employees is based on the direction of the State Auditor (*See* **Exhibit A**).

198.   Plaintiff and the members of the class to which Plaintiff belongs are entitled to relief in mandamus against the Elected Defendants to compel them by judicial order, individually and collectively, to authorize wage payments, approve warrants, and issue payment of the wage arrearage as aforesaid to Plaintiff and the members of the class to which Plaintiff belongs were expended otherwise by the Defendants.


*WHEREFORE*, the Plaintiffs, Heather Morris, Pamela Stumpf, Stacey Facemire, Lula V. Dickerson, Lisa Wilkinson and Kathryn A. Bradley as Class Representatives, pray for the following relief:

A.   That the Court certifies the Class under **Rule 23 of the Federal Rules of Civil Procedure** and appoints the Plaintiffs as Class Representatives and Ranson Law Offices, Jacobs Law Office, Toriseva Law and McCoid Law Offices, P.L.L.C. as Class counsel;

B.   That the Court grant their writ of Mandamus;

C.      That the Court enter judgment against the defendants for all damages, including but not limited to unpaid and lost wages, lost benefits, compensatory and general damages, as well as for costs, attorney fees, and statutory damages in an amount to be set by the jury or the Court

D.      That the Court grant them liquidated damages for the willful violation of West Virginia law.

E.      That the Court grant any other relief the Court finds that is equitable or allowed by law.

> **HEATHER MORRIS, PAMELA STUMPF, STACEY FACEMIRE, LULA V. DICKERSON, LISA WILKINSON, AND <u>KATHRYN A. BRADLEY</u>**
> By Counsel

*s/ J. Michael Ranson*

**J. Michael Ranson, WV State Bar # 3017**
**Cynthia M. Ranson, WV State Bar # 4983**
RANSON LAW OFFICES, PLLC
1562 Kanawha Blvd., East
Charleston, West Virginia 25311
(304) 345-1990

**G. Patrick Jacobs, WV State Bar #1867**
JACOBS LAW OFFICE
7020 MacCorkle Ave, SE
Charleston, WV  25304

**Teresa C. Toriseva, WV State Bar #6947**
TORISEVA LAW
1446 National Road
Wheeling, WV 26003

**Robert McCoid, WV State Bar #6714**
McCoid Law Offices, P.L.L.C.
56-58 Fourteenth Street
PO Box 151
Wheeling, WV  26003

*Counsel for plaintiffs*